UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JACK REBOLLEDO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| TERRY EDEN in his individual capacity, and | ) CASE NO.: 1:12-CV-910-SEB-MJD |
| | ) |
| THOMAS KOPPEL in his individual capacity, | ) |
| | ) |
| Defendants. | ) |

## **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the Motion for Summary Judgment [Docket No. 40] filed by Defendants Terry Eden and Thomas Koppel on June 21, 2013, pursuant to Federal Rule of Civil Procedure 56. For the reasons detailed in this entry, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

### **Factual Background**

In December 2009, Plaintiff Jack Rebolledo was an officer with the Indianapolis Metropolitan Police Department (IMPD), a member of the Indiana National Guard, and an owner of nine firearms, some of which were issued by the IMPD. On Saturday, December 4, 2009, Rebolledo was stationed in South Bend, Indiana, for National Guard drills when he received a "disturbing phone call" from his girlfriend, Shelly Korous, who was at their home in Indianapolis. (Rebolledo Dep., Dkt. 44-1 at ECF p. 15.) Ms. Korous had recently suffered a miscarriage and sadly also been diagnosed with cancer. (Korous Aff., Dkt. 44-4 at ¶ 5.)

According to Rebolledo, Ms. Korous was "distraught," saying "she saw no reason to live, she just wanted to die." (Rebolledo Dep., Dkt. 44-1 at ECF pp. 15–16.) Concerned for her safety, and unable to reach her family, Rebolledo phoned his friend and fellow IMPD officer Norine Cooper to ask her to visit the home and check on Ms. Korous. (*Id.* at ECF pp. 16–17.)

What exactly Rebolledo told Officer Cooper remains in dispute. Officer Cooper testified that Rebolledo told her that Ms. Korous "was threatening suicide and had said, 'I have your gun and I'm going to end it all.'" (Cooper Aff., Dkt. 41-4 at ¶ 5.) Defendant Terry Eden, a Lieutenant with the IMPD, testified that Sgt. Rhonda Reynolds relayed to him that Korous had told Rebolledo "that she was sitting on her bed holding a gun to her head." (Eden Dep., Dkt. 41-2 at ECF pp. 2–3.)[1] Rebolledo maintains that he told Officer Cooper that Ms. Korous "was having a hard time with some medical problems, she was very distraught, I was concerned for her safety and welfare." (Rebelledo Dep., Dkt. 44-1 at ECF pp. 16–17.) He adds that he "may have said that she threatened to get my gun. Shelly said something about getting my gun." (*Id.* at ECF p. 19.)[2] Ms. Korous maintains that she was never in possession of a gun on December 4 and never told Rebolledo or anyone else that was holding a gun to her head. (Korous Aff., Dkt. 44-4 at ¶ 6.)

After phoning Officer Cooper, Rebelledo spoke by phone with Sgt. David Wisneski. (Wisneski Aff., Dkt. 41-7 at ¶ 5; Rebolledo Dep., Dkt. 44-1 at ECF pp. 17–18.) Sgt. Wisneski had learned of Ms. Korous's condition, and Rebelledo expressed concern about leaving her home alone with access to his firearms—particularly because the lock on his gun safe was not operational. (Wisneski Aff., Dkt. 41-7 at ¶ 5; Rebolledo Dep., Dkt. 44-1 at ECF pp. 17–18.)

---

[1] We have doubts about the admissibility of Lt. Eden's testimony. He recounts a statement from Sgt. Reynolds, about information from an unspecified source. This is at least double-hearsay. But, because Rebolledo has not objected to its consideration on this motion, we shall allow it.

[2] We note that Defendants have referenced additional testimony concerning the content of Rebelledo's conversation with Ms. Korous, but we have not considered that testimony because, although Defendants reference an affidavit from Sgt. Reynolds (*e.g.*, Dkt. 42 at 7), they failed to include that affidavit in their Designation of Evidence (*see* Dkt. 41).

2

Rebolledo requested that Sgt. Wisneski go to the house, collect all his firearms, and keep them safe until Rebelledo returned to Indianapolis the following day. (Rebolledo Dep., Dkt. 44-1 at ECF pp. 17–18; Wisneski Aff., Dkt. 41-7 at ¶¶ 6–7.) Sgt. Wisneski did as Rebolledo asked: He visited the home, collected Rebolledo's seven personal firearms, placed them in the trunk of his patrol car, and agreed to return them to Rebolledo on December 5. (Wisneski Aff., Dkt. 41-7 at ¶¶ 6–9, 12–13.)

December 4 was not the first time police had been summoned to the Rebolledo-Korous residence. On March 28, 2010, Officer Cooper and other IMPD officers previously visited the home to investigate after Ms. Korous had discharged one of Rebolledo's firearms inside the house. (Cooper Aff., Dkt. 41-4 at ECF p. 5.) According to Officer Cooper, Ms. Korous discharged the weapon in the course of a domestic dispute. (*Id.* at ECF ¶ 7.) Ms. Korous maintains that she discharged the weapon accidentally while trying to unload it and denies that this took place during a domestic dispute. (Korous Aff., Dkt. 44-4 at ¶¶ 3–4.)

After observing Ms. Korous's mental condition on December 4, and remembering that she had discharged a gun in the home some nine months prior, Officer Cooper placed Ms. Korous "under an immediate detention hold and personally transported her to Community Hospital East." (Cooper Aff., Dkt. 41-4 at ¶¶ 8–9.) Ms. Korous met with a variety of mental health practitioners and was discharged after only a brief stay. (Korous Aff., Dkt. 44-4 at ¶¶ 10–11.)

Rebelledo returned home from his National Guard drill at approximately 7:00 P.M. on December 5, while Ms. Korous was still at work. (Rebolledo Dep., Dkt. 44-1 at ECF p. 20.) In an attempt to terminate his relationship with Ms. Korous, Rebelledo undertook to change the locks on the exterior doors and began to place her personal effects in the yard. (*Id.*) When Ms. Korous

3

returned home from her shift around 7:30, the couple became engaged in a loud, verbal argument lasting approximately ten to fifteen minutes. (*Id.* at ECF pp. 21–22; Korous Aff., Dkt. 44-4 at ¶¶ 13–15.) The couple's four children were home at that time and could hear the argument. (Rebolledo Dep., Dkt. 44-1 at ECF p.22.) Someone (either Ms. Korous or Rebolledo's children) notified Rebolledo's ex-wife who was the mother of his children of the argument, and she phoned the IMPD. (*See* O'Connor Aff., Dkt. 41-5 at ¶ 8, ECF pp. 5–6.)

When IMPD Officer Michael O'Connor arrived at the Rebolledo-Korous home shortly after 8:00 P.M., "there was no active disturbance evident." (Police Report, Dkt. 41-5at 6.) According to O'Connor, both parties denied that there had been any physical violence, and "there were no visible signs of any injury to either party." (*Id.*) Lt. Eden, who had been notified of the incident, set out to go to the residence but resumed his patrol after receiving O'Connor's all clear assessment by radio. (Eden Dep., Dkt. 44-5 at ECF pp. 11–12, Dkt. 44-6 at ECF p. 1.) Lt. Eden was informed that, to de-escalate the situation, Rebolledo had agreed to leave the home and stay with relatives in Chicago, but he wished to take a shotgun with him. (Eden Dep., Dkt. 44-6 at ECF p. 1.) Lt. Eden approved this plan pending confirmation from Chicago police that Rebolledo would not be violating local law by taking a shotgun with him into the city. (*Id.* at ECF pp. 1–2.)

Meanwhile, Sgt. Wisneski who had begun his shift was driving toward the Rebolledo residence to return Rebolledo's firearms, as he had agreed to do the night before. (Wisneski Dep., Dkt. No. 41-7 at ¶¶ 14–15.) After learning via his in-car computer that officers were present at the Rebolledo-Korous home, he decided to consult with Defendant Koppel, an IMPD Commander, about the advisability of returning Rebolledo's firearms. (*Id.*) Cmdr. Koppel instructed Sgt. Wisneski to speak with Lt. Eden, whom Koppel assumed had been or would be

on the scene, before releasing any weapons to Rebolledo. (Koppel Dep., Dkt. 44-9 at ECF pp. 11–12.) Sgt. Wisneski relayed these instructions to Lt. Eden, and Lt. Eden consulted with Cmdr. Koppel before proceeding to the residence. (*Id.* at ECF p. 12.; Eden Dep., Dkt. 44-6 at ECF pp. 5–7.)

The events that occurred when Lt. Eden arrived on the scene are in substantial dispute. According to Lt. Eden, he first spoke with Rebolledo, who showed him text messages Ms. Korous and her father had sent to him the night before to explain his reason for locking Ms. Korous out of the house. (Eden Dep., Dkt. 44-6 at ECF pp. 7–9.) Next, Lt. Eden spoke with Ms. Korous, who told him that Rebolledo suffered from post-traumatic stress disorder (PTSD)[3], that he had not been taking his prescribed medications, and that she feared he might hurt himself if he regained possession of his firearms that evening. (*Id.* at ECF pp. 9–10.) Ms. Korous clarified, however, that she was not afraid that Rebolledo would hurt her and that he had not expressed any suicidal thoughts. (*Id.* at ECF p. 10.) Lt. Eden testified that he felt some confusion or doubt about the veracity Ms. Korous's statements but regarded them as cause for concern, especially considering that he knew of the incident that had taken place the night before and the fact that the lock on Rebolledo's gun-safe was inoperable. (*Id.* at ECF pp. 10–11.)

Ms. Korous offers a markedly different account. She claims that Lt. Eden spoke with her upon arriving at the scene and that their conversation lasted between 30 and 45 minutes. (Korous Aff., Dkt. 44-4 at ¶ 17.) She told Lt. Eden that Rebolledo was mentally stable and that he had never physically abused their children or his ex-wife. (*Id.* at ¶¶ 19–21.) Ms. Korous claims she never spoke with Lt. Eden about PTSD or medications. (*Id.* at ¶ 23.) She also claims that she had no concerns about Rebolledo presenting a threat to her, to himself, or to their children, even if he

---

[3] Lt. Eden has testified that Rebolledo later admitted to suffering from PTSD. (Eden Dep., Dkt. 44-6 at ECF p. 9.) Rebolledo did not discuss this conversation in his deposition testimony.

5

regained possession of his weapons that night, and that she never indicated anything of the sort. (*Id.* at ¶¶ 24–27.) Further, she denies that Lt. Eden ever asked whether she had concerns about Rebolledo regaining possession of his weapons that night. (*Id.* at ¶ 22.)

After speaking to Rebolledo and Ms. Korous, Lt. Eden determined that the IMPD would not release any of Rebolledo's weapons that evening. Lt. Eden had begun to doubt whether Rebolledo actually would travel to Chicago (Eden Dep., Dkt. 44-7 at ECF pp. 4–5), and, considering the events of the previous night and Ms. Kouros's statements (by Lt. Eden's account) about Rebolledo's mental state, Lt. Eden questioned the safety of returning the weapons (*id.* at ECF p. 10). Accordingly, Lt. Eden informed Rebolledo that he would not release his weapons to him that evening. (Rebolledo Dep., Dkt. 44-2 at ECF p. 2.)

Rebolledo objected asking to speak with Cmdr. Koppel. (*Id.* at ECF pp. 2–3.) Lt. Eden phoned Cmdr. Koppel from the scene and placed Rebolledo on the line with him. (*Id.* at ECF pp. 3–4.) Rebolledo described the situation and explained his objections, but his requests were unavailing. (*Id.* at ECF p.4.) Cmdr. Koppel instructed Rebolledo to cooperate with Lt. Eden's instructions and hand over any other weapons he had in his possession lest he "be disciplined and subject to arrest." (*Id.*) Cmdr. Koppel explained that he received his instructions from his supervisor, the deputy chief, to retain all of Rebolledo's weapons that evening and return them thereafter through Rebolledo's supervisor, Lt. George Crooks. (Koppel Dep., Dkt. 44-10 at ECF p. 13.) Cmdr. Koppel phoned Lt. Eden with instructions that no one release Rebolledo's weapons that evening. (Koppel Dep., Dkt. 44-11 at ECF p. 1.)

Lt. Eden then asked Rebolledo where his remaining weapons were. (Rebolledo Dep., Dkt. 44-2 at ECF p. 5) Rebolledo retrieved his duty belt, which included a handgun, and surrendered it to Lt. Eden. (*Id.*) At that point, Rebolledo expressed a desire to resign from the

police force, but Lt. Eden refused his resignation and instructed him to retrieve the shotgun from the trunk of his patrol car. (*Id.*) This exchange between Rebolledo and Lt. Eden apparently became heated, and Korous "observed Lt. Eden in [Rebolledo]'s face pointing his finger at him." (Korous Aff., Dkt. 44-4 at ECF ¶ 29; *see also* Wisneski Aff., Dkt. 41 at ¶¶ 18–19.) Rebolledo ultimately complied with Sgt. Wisneski's order and gave the shotgun to him, who locked it in the trunk of his patrol car with Rebolledo's duty belt and the weapons he had collected the night before. (Rebolledo Dep., Dkt. 44-10 at ECF p. 6; Wisneski Dep., Dkt. 41-7 at ¶¶ 20–21.) As instructed by Cmdr. Koppel and Lt. Crooks, Sgt. Wisneski secured all of Rebolledo's firearms in the IMPD property room as "personal property found." (Wisneski Dep., Dkt. 41-7 at ¶ 22, ECF pp. 5–7.)

The encounter at the Rebolledo-Kouros home lasted approximately 45 minutes. (Rebolledo Dep., Dkt. 44-2 at ECF p. 6.) At least five IMPD officers—not counting Rebolledo—had been present on the scene for one reason or another. (Eden Dep., Dkt. 44-7 at ECF pp. 11–12.)

Rebolledo was off duty the following day, Monday, December 6. (Rebolledo Dep., Dkt. 44-2 at ECF p. 10.) On December 7, Rebolledo visited the property room with Lt. Crooks and was given his IMPD-issued handgun, but the remaining weapons were not relinquished. (*Id.*) After several unsuccessful attempts, Rebolledo enlisted the help of his superiors as well as an attorney to retrieve his remaining eight firearms, finally regaining possession of all of them in February of 2011. (Rebolledo Dep., Dkt. 44-3 at ECF pp. 2–3.)

In July of 2012, Rebolledo initiated this lawsuit, alleging pursuant to 42 U.S.C. § 1983 that Lt. Eden and Cmdr. Koppel had violated his rights as protected by the Second and Fourth Amendments to the United States Constitution. (Dkt. 1.) The Defendants filed their Motion for

Summary Judgment on July 21, 2013 (Dkt. 40), and the following month moved to strike certain evidence Rebolledo tendered in response (Dkt. 47). Having recently resolved the evidentiary questions raised in the motion to strike, we now address the Defendants' Motion for Summary Judgment.

## Legal Analysis

### I. Standard of Review

Summary judgment is appropriate on a claim if the moving party can show that there is no genuine dispute as to any material fact, leaving it entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphyisical doubt as to the material facts, *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Here, as the moving party, Defendants "bear the initial responsibility of informing the district court of the basis for [their] motion," and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at

323. Because Plaintiff, the non-moving party, will bear the burden of proof at trial, Defendants may discharge their burden at this stage of the proceedings by showing an absence of evidence to support Plaintiff's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in Plaintiff's favor, if genuine doubts remain and a reasonable fact-finder could find for Plaintiff, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). But if it is clear that Plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## II. Discussion

Defendants asserted two grounds for summary judgment. First, they argue that the doctrine of qualified immunity precludes liability on Rebolledo's constitutional claims. Second, they argue that Rebolledo's claims under the Indiana Constitution fail as a matter of law. Because Rebolledo has voluntarily withdrawn his Indiana Constitutional claims (Dkt. 44 at 22), we address only the issue of qualified immunity.

Under the doctrine of qualified immunity, public officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). Thus, "[d]efeating qualified immunity requires (1) conduct violating the plaintiff's constitutional or

statutory rights that is (2) clearly established at the time of the violation such that a 'reasonable official would understand that what he is doing violates that right.'" *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (quoting *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000)). Where qualified immunity is asserted as the basis for summary judgment, the Court must accept the plaintiff's version of the facts and determine whether they "make out a violation of clearly established law." *Huff v. Reichert*, No. 13-1734 at *5 (7th Cir. Mar. 10, 2014) (slip opinion) (citing *Jewett v. Anders*, 521 F.3d 818, 819 (7th Cir. 2008)).

### A. Fourth Amendment Claims

Rebolledo first argues that Defendants violated his Fourth Amendment right to be free from unreasonable seizures of his personal effects. It is a "'basic principle of Fourth Amendment' law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). Nonetheless, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Defendants assert that their seizure of Rebolledo's firearms was justified by two of those exceptions: Rebolledo's consent and exigent circumstances.

#### 1. Consent

"A consensual seizure of property without a warrant does not violate the Fourth Amendment." *Tucker v. Williams*, 682 F.3d 654, 659 (citing *United States v. Matlock*, 415 U.S. 164, 171 (7th Cir. 2006)). Whether a person has voluntarily—and, therefore, validly—consented to a search or seizure is "a question of fact that depends on the totality of the circumstances." *United States v. Richards*, 741 F.3d 843, 848 (7th Cir. 2014) (applying *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). To gauge voluntariness, the Court must consider (1)

Rebolledo's age, education, and intelligence; (2) whether he was informed of his constitutional rights; (3) whether he was in custody; (4) how long he was detained; (5) whether he consented immediately, or after police made several requests; and (6) whether the police used physical coercion. *Id.* (applying *Schneckloth*, 412 U.S. at 226).

The scope of a person's consent is also relevant. "Generally speaking, a person who has given valid consent to a seizure may limit or withdraw that consent." *Tucker*, 682 F.3d at 660 (citing *Florida v. Jimeno*, 500 U.S. 248, 252 (1991)). As Defendants concede, "[t]he standard for measuring the scope of consent under the Fourth amendment is one of objective reasonableness and asks what a reasonable person would have understood by the exchange between the law enforcement agent and a person who gives consent." *Id.*

The facts, when construed in Rebolledo's favor, as we are required to do at this stage of the litigation, suggest that the seven firearms Rebolledo turned over to Sgt. Wisneski on December 4 were seized without his consent. It is clear that Rebolledo consented to Wisneski's taking those weapons on December 4, but the scope of his consent was limited. Wisneski was to return the weapons to Rebolledo on December 5. (Rebolledo Dep., Dkt. 44-1 at ECF p. 18; Wisneski Aff., Dkt. 41-7 at ¶ 13.) When he failed to do so, a non-consensual seizure was effected.

Construed in Rebolledo's favor, these facts further preclude summary judgment as to the Defendants' seizure of Rebolledo's duty weapon and shotgun on December 5. Rebolledo initially sought to leave his residence for Chicago with one of his firearms, but the Defendants prevented his doing so; first by demanding he get clearance from Chicago authorities (Eden Dep., Dkt. 44-6 at ECF pp. 1–2), and then by demanding that he surrender all of his weapons (Rebolledo Dep., Dkt. 44-2 at ECF p. 4). The encounter with police at Rebolledo's home lasted 45 minutes. (*Id.* at

11

ECF p. 6.) Rebolledo did not surrender his weapons immediately, only after asserting his rights to keep them, appealing to a higher authority, and being told he would face arrest unless he complied. (*Id.* at ECF pp. 3–4.) At least five officers were present in Rebolledo's home (Eden Dep., Dkt. 44-7 at ECF pp. 11–12.), and Lt. Eden was allegedly "in [Rebolledo]'s face pointing his finger at him" (Korous Aff., Dkt. 44-4 at ECF ¶ 29). Given these facts, we cannot say that Rebolledo voluntarily consented to having his duty weapon and shotgun seized on December 5.

### 2. Exigent Circumstances and Public Safety

Defendants also argue that their seizure of Rebolledo's firearms was reasonable because it was compelled by exigent circumstances. As Defendants note, the exigent circumstances exception allows police to effect a warrantless search or seizure "when there is a compelling need for official action and no time to secure a warrant." *United States v. Saadeh*, 61 F.3d 510, 516 (7th Cir. 1995).

The officers' own statements cast doubt as to whether exigent circumstances did actually exist on December 5. For example, Officer O'Connor reported that there was no emergency or sign of violence when he arrived on the scene. (Police Report, Dkt. 41-5 at 6.) Lt. Eden accepted that report, opting to continue his patrol rather than proceed directly to the residence. Eden Dep., Dkt. 44-5 at ECF pp. 11–12, Dkt. 44-6 at ECF p. 1.) Once he arrived there, he expressed no concerns about Rebolledo's departure with a shotgun. (Eden Dep., Dkt. 44-6 at ECF pp. 1–2.) Moreover, while Lt. Eden described the December 4 incident as "an immediate emergency," he conceded that December 5 presented a "different situation." (Eden Dep., Dkt. 44-7 at ECF p. 10.)

Defendants allege that Ms. Korous's statement that Rebolledo might hurt himself if he regained possession of his weapons weighs in favor of finding exigent circumstances to have existed on December 5. (Eden Dep., Dkt. 44-6 at ECF pp. 9-10). However, whether Ms. Korous

in fact made such a statement remains in dispute. (Korous Aff., Dkt. 44-4 at ¶¶ 23–27.) Resolving that dispute requires a credibility determination that is inappropriate on summary judgment. Outside of Ms. Korous's alleged statement, no officer observed any evidence of an active dispute until they refused to return Rebolledo's weapons, which undermines their claim of exigent circumstances on December 5.

Disputed issues of material fact also remain with regard to whether the officers could have obtained a warrant before confiscating Rebolledo's firearms. At all times during the incident on December 5, Rebolledo apparently had firearms in his physical possession only long enough to hand them over to IMPD officers. The seven weapons Sgt. Wisneski collected on December 4 remained secured in the trunk of his patrol car. With five officers on the scene and no signs of violence, the facts, construed in Rebolledo's favor, suggest that an officer could have easily been dispatched to obtain a warrant before the weapons were impounded.

### 3. Clearly Established Constitutional Rights

We are unable to conclude that Rebolledo's Fourth Amendment rights which were allegedly violated by the officers were not clearly established as of December 5, 2010. Defendants concede that Rebolledo can defeat summary judgment based on qualified immunity if he can show that Defendants conduct was "'so egregious that no reasonable [police officer] could have believed that it would not violate clearly established rights.'" (Dkt. 42 at 25 (quoting *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008)).) The principle that a seizure of property must be justified by either a warrant or an exception to the warrant requirement is fundamental and well established. The disputed facts raised by Rebolledo, if proven true, could establish that no competent officer would have found a prudent rationale for seizing his weapons without first

obtaining a warrant, which would defeat Defendants immunity claim and entitle Rebolledo to relief on this constitutional violation. Summary judgment is not available.

### B. Second Amendment Claims

Defendants advance two theories that they contend preclude a finding that they violated Rebolledo's clearly established Second Amendment rights. First, they argue that the seizure of Rebolledo's firearms was lawful under an Indiana statute providing for the warrantless seizure of firearms from persons believed to be dangerous. Second, Defendants assert that there is insufficient evidence that they were individually involved in the IMPD's refusal to release Rebolledo's firearms from the IMPD Property Room on December 7.

#### 1. Indiana Code § 35-47-14

Defendants cite Section 35-47-14 of the Indiana Code—commonly referred to as "Laird's Law"—which permits police officers to seize firearms without a warrant from a person they believe to be dangerous. Defendants offer two grounds for invoking this statute. First, they argue that they reasonably perceived Ms. Korous to be dangerous on December 5 because of her documented suicidal threats on December 4 and her documented discharge of a firearm approximately eight months earlier. Second, they contend that they reasonably perceived Rebolledo to be dangerous because (a) he told Lt. Eden that he suffered from PTSD and was prescribed Zoloft to manage his symptoms; (b) Ms. Korous told Lt. Eden that Rebolledo was not taking his medication; and (c) Ms. Korous told Eden she was concerned that Rebolledo might hurt himself if the firearms were returned to him that night.

The Defendants' first contention fails because they are accused of seizing weapons from Rebolledo, not from Korous. Laird's Law entitles police to seize firearms from an individual they perceive to be dangerous. IND. CODE § 35-47-14-3(a). On its face, Laird's Law does not

14

empower police to seize firearms from an individual who happens to be with a person they perceive to be dangerous, and Defendants point to no authority suggesting that the statute should be interpreted in such fashion. No evidence indicates the firearms were seized from Korous or that she was in possession of any weapon on December 5. In fact, Cmdr. Koppel testified to the contrary. (Koppel Dep., Dkt. 44-10 at ECF p. 8.) Accordingly, whether the officers reasonably perceived Korous as dangerous on December 5 is immaterial to their Second Amendment argument.

Disputes of material fact preclude Defendants' contention that they had grounds to reasonably believe that Rebolledo was dangerous on December 5. Ms. Korous has testified that she never told Lt. Eden that Rebolledo suffered from PTSD, that he had not been taking his medication, or that she was concerned that he would harm himself if the police did not seize his firearms. (Korous Aff., Dkt. 44-4 at ¶¶ 23–27.) Accordingly, Defendants' argument rests on a single fact that has not been specifically contradicted by Rebolledo, namely that Rebolledo told Lt. Eden he suffered from PTSD. (Eden Dep., Dkt. 44-6 at ECF p.8.) Laird's Law deems a person dangerous if he "has a mental illness that may be controlled by medication, and has not demonstrated a pattern of voluntarily and consistently taking [his] medication while not under supervision." IND. CODE § 35-47-14-1(a)(2)(A) (emphasis added). The statute specifically provides that "[t]he fact that an individual . . . has a mental illness that is currently controlled by medication does not establish that the individual is dangerous for the purposes of this chapter." IND. CODE § 35-47-14-1(b). Therefore, even if shown to be true -- that Rebolledo suffered from PTSD – that would not be enough to justify the officers alleged belief or perception that he was "dangerous" as defined in Laird's Law.

15

Finally, the officers' own actions create an issue of material fact as to these arguments. As Rebolledo notes, Laird's Law does not give police officers carte blanche to seize weapons from people they perceive to be dangerous. It provides officers with two alternatives: they may use the perception of dangerousness as the basis to obtain a warrant, IND. CODE § 35-47-14-2, or they may use the perception of dangerousness as the basis for a warrantless seizure, IND. CODE § 35-47-14-3. But, an officer who seizes weapons without a warrant must submit an affidavit to a judge explaining his belief that the owner was dangerous. IND. CODE § 35-47-14-3(a). The judge must then determine whether probable cause exists to justify the police retaining possession of the firearm. IND. CODE § 35-47-14-3(b). No evidence has been adduced here to suggest that any officer ever executed an affidavit which was submitted to a judicial officer or that any judge ever issued a probable cause ruling. The officers' failure to comply with Laird's Law undermines their argument that they were justified by that statute to seize Rebolledo's firearms. Construing the facts in Rebolledo's favor as we are required to do on summary judgment, the officers did not in fact perceive Rebolledo as dangerous, thereby justifying the seizure of his weapons.

### 2. Individual Liability

Defendants next argue that they cannot be held individually liable for a Second Amendment violation under Section 1983 because Rebolledo cannot prove that they were involved in the decision to withhold his weapons from him, when he arrived for duty on December 7. This argument misconstrues the scope of the constitutional violation alleged, however. Rebolledo argues that his guns were seized—and his rights were violated—on December 5. The record overflows with evidence showing that Defendants participated in the decision to seize his firearms on December 5. That the evidence may not establish their

involvement in the decision to continue to hold them two days later does not mean that they did not violate Rebolledo's constitutional rights on December 5th.

### 3. Clearly Established Constitutional Rights

Again, viewing the facts in the light most favorable to Rebolledo, we find that a reasonable jury could find that Defendants' conduct was "'so egregious that no reasonable [police officer] could have believed that it would not violate clearly established rights.'" (Dkt. 42 at 25 (quoting *Chelios*, 520 F.3d at 691.) Rebolledo clearly possessed a Second Amendment right to possess his firearms. Defendants cite a series of cases in which courts have upheld firearms seizures against Second Amendment challenges, but all rested on a critical fact not applicable here, to wit, that each of those seizures occurred in the context of the plaintiff's threat of suicide. *See* Dkt. 46 at 13–14 (collecting cases). No evidence suggests Rebolledo ever threatened suicide. The only evidence to that effect is Ms. Korous's alleged statement to Lt. Eden that she feared Rebolledo would harm himself, though whether she actually made such a statement remains in dispute. Given the evidence adduced by Rebolledo, including the officers' failure to comply with Laird's Law regarding the seizure of firearms, we hold that a reasonable jury could find that no reasonable officer would believe he could seize and hold Rebolledo's firearms under the same circumstances and that he is entitled to prevail on his constitutional claims.

### Conclusion

For the foregoing reasons, we **DENY** the Defendants' motion for summary judgment as to Plaintiff's § 1983 claims. Because Plaintiff has withdrawn them, we **GRANT** summary judgment as to his state law claims. The case will proceed to trial accordingly.

IT IS SO ORDERED.

Date: __03/31/2014_____

*Sarah Evans Barker* (signature)

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Scott Leroy Barnhart
KEFFER BARNHART LLP
barnhart.scott@gmail.com

Beth Ann Garrison
OFFICE OF CORPORATION COUNSEL
beth.garrison@indy.gov

Amanda J. Griffith
Office of Corporation Counsel
agriffith@indy.gov

Andrew R. Duncan
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS & HASBROOK
ard@rucklaw.com

Edward J. Merchant
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS & HASBROOK
ejm@rucklaw.com

John F. Kautzman
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS & HASBROOK
jfk@rucklaw.com